1  Ryan Maher (*Pro Hac Vice,* D.C. Bar No. 1620024)
CENTER FOR BIOLOGICAL DIVERSITY
2  1411 K Street NW, Suite 1300
3  Washington, D.C. 20005
Phone: 781-325-6303
4  Email: rmaher@biologicaldiversity.org

5  Jonathan Evans (Cal. Bar No. 247376)
6  CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
7  Oakland, CA 94612
Phone: 213-598-1466
8  Email: jevans@biologicaldiversity.org

9
*Counsel for Plaintiffs Center for Biological*
10  *Diversity and Center for Environmental Health*

11

12              **UNITED STATES DISTRICT COURT**
        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13                **SAN FRANCISCO DIVISION**

14  _____
                                      )
15                                    )
                                      )
16  CENTER FOR BIOLOGICAL             )
    DIVERSITY and CENTER FOR          )   Case No. 3:22-cv-3309-RS
17  ENVIRONMENTAL HEALTH,             )
                                      )   **PLAINTIFFS' MOTION TO ENFORCE**
18              *Plaintiffs*,         )   **CONSENT DECREE**
                                      )
19          v.                        )   Hearing Date: Thursday, January 18, 2024
                                      )   Time: 1:30 P.M.
20  MICHAEL S. REGAN, in his official )   Place: Zoom videoconference requested
21  capacity as Administrator of the United )   Judge: Hon. Richard Seeborg
    States Environmental Protection Agency, )
22                                    )
                                      )
23              *Defendant*.          )
                                      )
24  _____)

25

26

27

28

1

2

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

GLOSSARY OF ACRONYMS ............................................................................................ iv

NOTICE OF MOTION .......................................................................................................... 1

RELIEF REQUESTED ........................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

   I.     STATEMENT OF THE ISSUE ............................................................................. 2

   II.    INTRODUCTION .................................................................................................. 2

   III.   BACKGROUND .................................................................................................... 5

      A.  Legal Background ........................................................................................ 5

      B.  Factual Background ..................................................................................... 7

   IV.   STANDARD OF REVIEW ................................................................................. 10

   V.     ARGUMENT ........................................................................................................ 12

      A.  Allowing states to "withdraw" SIP submittals contradicts the plain language of the Clean Air Act. ........................................................................................ 12

      B.  Withdrawal allows states and EPA to defeat Congressionally imposed and, in this case, court-imposed, deadlines. ................................................................. 14

      C.  Prior courts, including this Court, have rejected the withdrawal argument .............. 17

      D.  Withdrawal of SIP submittals interferes with other SIP requirements and undermines the Act as a whole. ................................................................................. 20

      E.  EPA should be required to act on the Reasonably Available Control Measures and Attainment Demonstration by March 15, 2024. ......................................... 23

CONCLUSION .................................................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Barhart v. Sigmon Coal Co.*
   534 U.S. 438 (2002)..................................................................................... 11

4

*Caminetti v. United States*
   242 U.S. 470 (1917)..................................................................................... 11

5

6

*Center for Biological Diversity, et al. v. EPA*
   Case No. 3:22-cv-01855-WHO (N.D. Cal. 2022) ...................................... 17

7

*Center for Biological Diversity, et al. v. EPA*
   Case No. 3:22-cv-03309-RS (N.D. Cal. 2022) ........................................... 17

8

*Center for Biological Diversity, et al. v. EPA*
    Case No. 23-cv-00148-JST (N.D. Cal. May 25, 2023)............................... 12

9

*Center for Biological Diversity, et al. v. EPA*
   Case No. 4:23-cv-00148-JST (N.D. Cal. 2023) .......................................... 10

10

*Communities for a Better Environment v. EPA*
   Case No. 3:07-cv-3678-JSW (N.D. Cal. 2007) .......................................... 17

11

12

*Communities for a Better Environment v. EPA*
   Case No. 3:07-cv-3678-JSW (N.D. Cal. 2007) .......................................... 17

13

*Earth Island Inst. v. Wheeler*
   464 F.Supp.3d 1138 (N.D. Cal. 2020) ........................................................ 11

14

*Frew v. Hawkins*
   540 U.S. 431 (2004)..................................................................................... 10

15

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*
   530 U.S. 1 (2000)......................................................................................... 11

16

*Hutto v. Finney*
   437 U.S. 678 (1978)..................................................................................... 10

17

18

*Negrete-Ramirez v. Holder*
   741 F.3d 1047 (9th Cir. 2014) .................................................................... 11

19

*R.J. Reynolds Tobacco Co. v. Cty. of L.A.*
   29 F.4th 542 (9th Cir. 2022) ....................................................................... 16

20

*Rufo v. Inmates of Suffolk County Jail*
   502 U.S. 367 (1992)..................................................................................... 10

21

*Satterfield v. Simon & Schuster, Inc.*
   569 F.3d 946 (9th Cir. 2009) ...................................................................... 11

22

*Shelby v. Bartlett*
   391 F.3d 1061 (9th Cir. 2004) .................................................................... 16

23

24

*Sierra Club v. EPA*
   294 F.3d 155 (D.C. Cir. 2002) .............................................................. 12, 13

25

*Sierra Club v. Johnson*
   374 F.Supp.2d 30 (D.D.C. Apr. 6, 2005)............................................... 17, 18

26

*South Coast Air Quality Management District v. EPA*
   472 F.3d 882 (D.C. Cir. 2006)..................................................................... 23

27

*WildEarth Guardians v. Jackson*
   870 F.Supp.2d 847 (N.D. Cal. 2012) ............................................... 11, 13, 18

28

1

*WildEarth Guardians v. Jackson*
   Case No. 4:11-cv-2205-SI (N.D. Cal. 2011) ........................................................... 17

2

3

### Statutes

42 U.S.C. § 7407(d)(1)(A)(i) ..................................................................................... 5
42 U.S.C. § 7409(a)(1) ............................................................................................... 5
42 U.S.C. § 7410 ........................................................................................................ 6
42 U.S.C. § 7410(a)(1) ............................................................................................... 5
42 U.S.C. § 7410(c)(1) .................................................................................... 6, 13, 14
42 U.S.C. § 7410(c)(1)(A) ........................................................................................ 15
42 U.S.C. § 7410(k)(1)(B) .......................................................................................... 6
42 U.S.C. § 7410(k)(2)–(4) ............................................................................ 6, 8, 13, 14
42 U.S.C. § 7502(c)(1) ............................................................................................. 21
42 U.S.C. § 7511(a)(1) ............................................................................................... 5
42 U.S.C. § 7511(b)(2) ............................................................................................... 5
42 U.S.C. § 7511a ................................................................................................... 8, 9
42 U.S.C. § 7511a(i) ................................................................................................... 5
42 U.S.C. § 7513a(b)(1)(B) ..................................................................................... 22

### Regulations

40 C.F.R. § 51.100 ................................................................................................... 22

### Rules

80 Fed. Reg. 65,291 (Oct. 26, 2015) .......................................................................... 7
81 Fed. Reg. 58,009 (Aug. 24, 2016) ....................................................................... 22
88 Fed. Reg. 2,541 (Jan. 17, 2023) ............................................................................ 6
88 Fed. Reg. 23,353 (Apr. 17, 2023) ....................................................................... 15
88 Fed. Reg. 54,975 (Aug. 14, 2023) ......................................................................... 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **GLOSSARY OF ACRONYMS**

The following is a list of acronyms used in the Memorandum of Points and Authorities supporting Plaintiffs' Motion to Enforce the Consent Decree:

|      |                                           |
|------|-------------------------------------------|
| EPA  | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards   |
| SIP  | State Implementation Plan                 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION

Please take notice that on January 18, 2024, at 1:30 P.M. (P.T.), or as soon before or after as counsel may be heard before the Honorable Richard Seeborg, Plaintiffs Center for Biological Diversity and Center for Environmental Health (together, "Public Interest Groups") will and hereby do move to enforce Condition 1(a) of the parties' Consent Decree, which this Court approved in its June 15, 2023 order, Dkt. No. 37.  Pursuant to Chief Judge Seeborg's *Notice Re: Appearances and Continued Use of Zoom*, the Public Interest Groups hereby request that the hearing for this motion be conducted by Zoom videoconference, rather than in person.

## RELIEF REQUESTED

The Public Interest Groups respectfully seek an order from the Court:

(1)   Declaring that Defendant Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency ("EPA" or "Administrator"), failed to perform all of the actions required by Condition 1(a) of the Consent Decree and the Clean Air Act, 42 U.S.C. § 7410(k)(2)–(4);

(2)   Requiring EPA to perform the outstanding actions required by Condition 1(a) of the Consent Decree; namely, requiring EPA to sign a notice of final rulemaking making final determinations on (A) the Reasonably Available Control Measures and (B) Attainment Demonstration that Colorado submitted to EPA to address the requirements that apply to the Denver Metro / North Front Range nonattainment area as a former "serious" nonattainment area for the 2008 ozone National Ambient Air Quality Standards ("NAAQS");

(3)   Requiring EPA to take the final action required by paragraph 2 by a new date certain, specifically March 15, 2024, which will provide EPA with the same amount of time to perform this action as it initially agreed to in Condition 1(a) of the Consent Decree; and

(4)   Requiring EPA to forward, within 15 business days of signature, the signed notice required by paragraph 2 to the Office of Federal Register for review and publication in the Federal Register, as required by Condition 3 of the Consent Decree.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.     STATEMENT OF THE ISSUE

3

4      Whether EPA has failed to comply with Condition 1(a) of the Consent Decree by failing

5 to act on the elements of Colorado's State Implementation Plan submittal that Colorado claims to

6 have "withdrawn" from EPA's consideration.

7

8

### II.     INTRODUCTION

9

10      The Public Interest Groups brought this lawsuit to compel EPA to perform several

11 mandatory actions under the Clean Air Act, 42 U.S.C. §§ 7401–7671q, because the agency

12 missed the statutory deadlines to perform these actions.  Am. Compl., Dkt. No. 23, ¶ 1; *see* 42

13 U.S.C. § 7410(k)(2)–(4).  Among these overdue actions was EPA's obligation to take final action

14 on—*i.e.*, approve or disapprove—Colorado's State Implementation Plan ("SIP") submittal,

15 which Colorado submitted to EPA to meet the requirements of the Clean Air Act.  Am. Compl.

16 ¶¶ 41–42, 56; 42 U.S.C. § 7410(k)(2)–(4).

17

18      In the Consent Decree entered into by the parties and approved by this Court, EPA agreed

19 to sign a notice of final rulemaking fulfilling this mandatory duty with respect to Colorado by

20 September 29, 2023.  *See* Order by Judge Richard Seeborg Granting Motion to Approve Consent

21 Judgment, at Condition 1(a), Dkt. No. 37 (June 15, 2023) [hereinafter, "Consent Decree"].

22

23      While EPA has taken action on portions of Colorado's SIP submittal, and the parties have

24 stipulated to extensions of the deadlines for other portions, EPA has neither acted on or extended

25 the deadline for two specific parts, or "elements," of Colorado's SIP submittal: (1) the

26 Attainment Demonstration, and (2) the Reasonably Available Control Measures.

27

28

1
2
3
4
5
6
7
8
9
10

     This is a violation of the Consent Decree.  EPA claims that it no longer has an obligation to act on these two elements because Colorado "withdrew" the elements from EPA's consideration.  But neither the Clean Air Act nor EPA's regulations provide for the "withdrawal" of SIP submissions, and the unsupported mechanism of withdrawal directly undermines the clear requirements and deadlines in the Act, as well as those in the Consent Decree.  Accordingly, the Public Interest Groups now move the Court to reject the unsupportable concept of withdrawal and to enforce the Consent Decree, by requiring EPA to act on the Attainment Demonstration and the Reasonably Available Control Measures submitted by Colorado.

11
12
13
14
15
16
17
18

     Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1, 1, 1970 U.S. Code Cong. & Admin. News 5356, 5356 (emphasis added).  The NAAQS are arguably the most important tool in this war against air pollution.  The NAAQS are limits on the maximum airborne concentration of certain pollutants, including ozone, and are set at the level necessary to protect human health and welfare all across the country.

19
20
21
22
23
24
25

     The NAAQS, however, are not self-executing.  Instead, the public health and welfare benefits from the NAAQS are only achieved through a state's adoption of a State Implementation Plan, or SIP, which is the collection of regulations, guidance, and analyses the state will use to attain, maintain, and enforce the NAAQS.  States develop SIPs, but EPA must approve or disapprove them.  When a state fails to submit an adequate SIP to EPA, EPA must promulgate a Federal Implementation Plan, where EPA fills the gap left by the state's failure.

26
27
28

     Especially in a nonattainment area like Colorado's Denver Metro Nonattainment Area, which has some of the most contaminated air in the country, any delay in the adoption of SIPs

means delay in providing the public with relief from the harms of air pollution.  This includes the harms from ozone.  The Denver Metro Nonattainment Area has suffered under the weight of ozone pollution in excess of the health-based standards since it was first designated as a nonattainment area for the 2008 ozone NAAQS, and this pollution predates the standards. Children graduating from high school have lived with this harmful pollution for their entire lives. The Denver Metro Nonattainment Area includes eight counties and part of another that, all together, are home to over 3.3 million Coloradans.  EPA, Green Book: 8-Hour Ozone (2015) Designated Areas by State/County/Area (Sept. 30, 2022), https://www3.epa.gov/airquality/ greenbook/jbcty.html.  Even though EPA's original deadline to take action on Colorado's SIP submittal passed 18 months ago, EPA now seeks to further postpone taking the next step towards real pollution reduction measures that will clean up the problem.

Tragically, both EPA and states regularly miss the deadlines the Clean Air Act sets forth to ensure that the protections offered by the NAAQS are realized.  Now, instead of just missing a deadline, EPA seeks to use the unsupported mechanism of withdrawal to circumvent the requirements of the Clean Air Act and the obligation in the Consent Decree to act on Colorado's SIP submittal.  The delays that will result from allowing for withdrawal will cause harms that could be irreversible to the millions of people living in the nonattainment area.

Accordingly, we respectfully request that the Court order EPA to comply with the relevant portions of Condition 1(a) in the Consent Decree approved by this Court on June 15, 2023, by requiring EPA to sign a notice of final rulemaking to take action on the Reasonably Available Control Measures and Attainment Demonstration elements in Colorado's serious 2008 ozone NAAQS SIP submittal by a new date certain, specifically by March 15, 2024.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    BACKGROUND

#### A.    Legal Background

As discussed in the Amended Complaint, ¶¶ 28–35, the plain language of the Clean Air Act sets forth a clear, step-by-step process by which EPA must promulgate NAAQS, states must create SIPs to meet those NAAQS, and EPA must approve or disapprove those SIPs.  For each of these steps, Congress set forth clear statutory deadlines in the Clean Air Act, to ensure that people get the clean air that they are entitled to in a timely manner.

Pursuant to this process, EPA must promulgate new NAAQS or improve existing NAAQS as necessary to protect public health and welfare.  42 U.S.C. § 7409(a)(1), (b), (d)(1). After EPA promulgates a new or revised NAAQS, EPA must designate areas of the country that are not meeting the NAAQS as "nonattainment areas."  42 U.S.C. § 7407(d)(1)(A)(i).  Ozone nonattainment areas can be classified as marginal, moderate, serious, severe, or extreme, with dates by which the areas must come into attainment with the NAAQS that range from three to twenty years after designation.  42 U.S.C. § 7511(a)(1).  These classifications change over time if a nonattainment area's air quality fails to improve or worsens.  *Id.*

States that have nonattainment areas within their borders must submit SIPs to EPA that are designed to bring those areas into attainment with the NAAQS by the relevant attainment date.  42 U.S.C. § 7410(a)(1).  When a nonattainment area fails to attain the NAAQS by its deadline, it is reclassified to a worse level of nonattainment (e.g., from "moderate" to "serious" nonattainment), and the state must submit a new SIP submittal to EPA, because, clearly, the prior SIP failed.  42 U.S.C. §§ 7511(b)(2), 7511a(i).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EPA cannot dispute the indisputable—nowhere in the plain language of the Clean Air Act does it say that states can "withdraw" SIP submittals once they are submitted to EPA.  Nor does EPA cite to provisions in its own regulations permitting withdrawal, as there are none.

Instead, there are clear requirements and deadlines that adhere once EPA receives a state's SIP submittal.  Section 110(k) of the Clean Air Act, 42 U.S.C. § 7410(k), sets forth the process by which EPA must review SIP submittals once states submit them.  *Id*.  In accordance with that process, EPA must determine no later than 6 months after the SIP due date whether the SIP submittal meets the completeness criteria.  42 U.S.C. § 7410(k)(1)(B).  If EPA does not determine the completeness of the plan within 6 months, the submittal is deemed complete by operation of law.  *Id*.  After EPA determines that a SIP submittal is complete, or after the submittal is deemed complete by operation of law, EPA has 12 months to take final action on the SIP submittal, by approving or disapproving, in whole or in part, the submittal.  42 U.S.C. § 7410(k)(2)–(4).

If a state does not provide EPA with a SIP submittal by the submittal deadline, EPA is required to issue a Finding of Failure to Submit within six months of that deadline.  42 U.S.C. § 7410(k)(1)(B); *see, e.g.*, 88 Fed. Reg. 2,541 (Jan. 17, 2023).

In the event that a state fails to provide EPA with a SIP submittal, or if EPA disapproves a SIP submittal, EPA must fill the gap with a Federal Implementation Plan for the state.  42 U.S.C. § 7410(c)(1).  EPA has two years after finding that the state failed to submit a SIP submittal, or EPA disapproves a submittal, to do so.  *Id*.  But EPA does not need to produce a Federal Implementation Plan if the state remedies the deficiency with a new submission, and EPA approves the new SIP submittal, before EPA finalizes the Federal Implementation Plan.  *Id*.

**B.     Factual Background**

1.     Ozone Pollution and its Adverse Impacts

While ozone in the stratosphere, *i.e.*, the ozone layer, is critical to protecting people from harmful ultraviolet rays, ground-level ozone is a dangerous air pollutant that causes a variety of adverse impacts.  According to EPA, which conducted an exhaustive scientific review, exposure to ozone pollution can decrease lung function, increase respiratory symptoms, and, over time, lead to chronic effects such as chronic bronchitis or long-term lung damage that can impair quality of life and even cause death.  *See* 80 Fed. Reg. 65,292, 65,302–17 (Oct. 26, 2015). Ozone is also associated with aggravation of asthma, increased use of medication, increased school and work absences, increased susceptibility to respiratory infection, increased visits to doctors' offices and emergency departments, and increased admissions to hospitals.  *Id.*  The evidence is also suggestive of a causal relationship between exposure to ozone and adverse reproductive and developmental effects, including adverse birth outcomes.  *Id*. at 65,338. Children, the elderly, people with respiratory conditions like asthma, and people who work or recreate outdoors are most at risk from ozone.  *See id*. at 65,322.

Ozone also damages vegetation, including both native and commercial crops.  *Id.* at 65,369–79.  Observed ozone impacts on vegetation include reduced tree growth, seedling and mature tree biomass loss, reductions in crop yields, visible foliar injury, and reduced plant vigor. *Id*.  Studies reveal that important tree species such as quaking aspen, black cherry, and tulip poplar experience biomass loss due to ozone exposure.  *Id.*  More broadly, damage to native vegetation results in ecosystem damage, including diminished ecosystem services, that is, the life-sustaining services that ecosystems provide to people for free, such as clean air, clean water, and carbon sequestration.  *Id.*

2.    <u>Procedural History</u>

It was in the interest in protecting against these harms that, on June 7, 2022, the Public

Interest Groups filed suit against EPA for its illegal delay in, *inter alia*, taking action on several

states' SIP submittals.  Compl., Dkt. No. 1.  The Public Interest Groups filed their amended

complaint on September 12, 2022, to add additional claims of the same nature.  Am. Compl.,

Dkt. No. 23.  The Public Interest Groups' first claim included the claim that EPA failed to

perform the mandatory duty required by Clean Air Act section 110(k)(2)–(4), 42 U.S.C. §

7410(k)(2)–(4), to take final action to approve or disapprove, in whole or in part, the SIP

submittal Colorado sent to EPA on March 22, 2021.  Am. Compl. ¶¶ 41-42, 56.  Colorado's SIP

submittal, which included the Attainment Demonstration and Reasonably Available Control

Measures elements that are the subject of this motion, was intended to address the requirements

of Section 182(c) of the Clean Air Act, 42 U.S.C. § 7511a(c), for the Denver Metro

Nonattainment Area as a serious nonattainment area for the 2008 ozone NAAQS.  *Id.*

After Colorado provided EPA with this SIP submittal, EPA determined that the SIP

submittal was complete via a letter dated June 2, 2021.  *See* Letter from Acting Director Carl

Daly, Air and Radiation Division, EPA Region 8, to Division Director Garry Kaufman, Air

Pollution Control Division, Colorado Dep't of Public Health and Env't (June 2, 2021) (Exhibit

2).  Pursuant to 42 U.S.C. § 7410(k)(2)–(4), this determination of completeness required EPA to

take final action on Colorado's SIP submittal within 12 months, by June 2, 2022.

Because EPA did not act on the submittal by this deadline, or after it, the Public Interest

Groups and EPA agreed to the following in Condition 1(a) of the Consent Decree:

1. The appropriate EPA official shall:

a.    **sign a notice of final rulemaking** to approve,
disapprove, conditionally approve, or approve in

1
2
3
4
5

part and conditionally approve or disapprove in part, a SIP submittal submitted by Colorado addressing the requirements of CAA section 182(c), 42 U.S.C. § 7511a, requirements for the Denver Metro/North Front Range Serious nonattainment area (codified at 40 C.F.R. § 81.306) under the 2008 ozone NAAQS **no later than September 29, 2023**.

6    Consent Decree at 7 (emphasis added).

7          After this Court entered the Consent Decree on June 15, 2023, Colorado "withdrew" two

8    important elements of its SIP submission, the Reasonably Available Control Measures and

9    Attainment Demonstration, by a letter dated July 5, 2023.  *See* Letter from Executive Director

10   Jill Ryan, Colorado Dep't of Public Health and Env't, to Regional Administrator KC Becker,

11   EPA Region 8 (July 5, 2023) (Exhibit 3).

12

13         EPA then published a proposed rule on August 14, 2023, proposing to approve and

14   disapprove several elements of Colorado's SIP submittal.  88 Fed. Reg. 54,975 (Aug. 14, 2023).

15   In Footnote 17 of this proposed rule, EPA stated: "By letter dated July 5, 2023, **the state**

16   **withdrew its previous submission** of an attainment demonstration and RACM [(Reasonably

17   Available Control Measures)] for the Serious area SIP.  **Accordingly, the EPA does not have**

18   **these items before it to act on, and we are therefore not proposing any action with respect**

19   **to these two Serious area SIP elements.**"  *Id*. at 54,976 n.17 (emphasis added).  Thus, EPA has

20   expressly stated that it will not act on the Reasonably Available Control Measures or Attainment

21   Demonstration.  Under the Consent Decree signed in this case, EPA was required to act on these

22   elements by September 29, 2023.  Thus, EPA has failed to meet this obligation as set forth in

23   Condition 1(a) of the Consent Decree.

24         In accordance with Conditions 8 and 9 of the Consent Decree, the Public Interest Groups

25   provided EPA with written notice of this issue more than 10 working days ago, via electronic

mail to opposing counsel and a telephone conference, outlining the nature of the dispute and requesting informal negotiations.  Because the parties were not able to resolve the dispute amongst themselves, the Public Interest Groups now move the Court for relief.

The issue of whether states can "withdraw" SIP submittals, and thereby override clear Clean Air Act deadlines, is concurrently pending before this Court in a case assigned to Judge Jon S. Tigar.  *Center for Biological Diversity, et al. v. EPA*, Case No. 4:23-cv-00148-JST (N.D. Cal. 2023).  The parties have completed motion practice on the issue after EPA moved to dismiss the case on the basis of California withdrawing its SIP submittal, and the parties are awaiting a decision from the Court on the motion.

## IV.  STANDARD OF REVIEW

This Court has jurisdiction to legally enforce the terms of the Consent Decree.  A consent decree has elements of both a contract and judicial decree and therefore embodies not merely an agreement of the parties, but an agreement "that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."  *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378 (1992); *see also Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (citing *Hutto v. Finney*, 437 U.S. 678 (1978) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, a consent decree may be enforced.")).  Here, such intent is embodied in the Consent Decree itself.  Condition 11 of the Consent Decree provides: "**This Court shall retain jurisdiction over this matter to enforce the terms of this Consent Decree** and to consider any requests for costs of litigation (including attorneys' fees)."  Consent Decree at 16 (emphasis added).

1    To determine whether EPA has improperly adopted the mechanism of withdrawal, the

2  Court must apply the traditional rules of statutory interpretation.  Pursuant to the "[g]eneral

3  canons of statutory interpretation, courts begin with the language of the statute to determine

4  whether it has a plain meaning." *Earth Island Inst. v. Wheeler*, 464 F.Supp.3d 1138, 1142–43

5  (N.D. Cal. 2020) (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)).

6  Where the language of the statute is plain, that is where the inquiry should end: "'the sole

7  function of the courts is to enforce [the statute] according to its terms,' assuming that an absurd

8  interpretation does not result." *WildEarth Guardians v. Jackson*, 870 F.Supp.2d 847, 851 (N.D.

9  Cal. 2012) (citing *Caminetti v. United States*, 242 U.S. 470 (1917); *Hartford Underwriters Ins.*

10  *Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

11    Further, "[i]n the context of an unambiguous statute, [the Court] need not contemplate

12  deferring to the agency's interpretation." *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1050 (9th

13  Cir. 2014) (quoting *Barhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002)).

14    "It is also a fundamental canon that the words of a statute must be read in their context

15  and with a view to their place in the overall statutory scheme." *Earth Island Inst.*, 464 F.Supp.3d

16  at 1143 (citations omitted); *see also City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir.

17  2019) ("In construing specific words in a statute, we must also look to the language and design

18  of the statute as a whole . . . and read the specific words with a view to their place in the overall

19  statutory scheme.") (citations omitted).  "In every case, it is the intent of Congress that is the

20  ultimate touchstone." *Barr*, 941 F.3d at 940 (citations omitted).

1

2

## V.    ARGUMENT

### A.    Allowing states to "withdraw" SIP submittals contradicts the plain language of the Clean Air Act.

EPA has never disputed that the plain language of the Clean Air Act says that states can "withdraw" SIP submittals.  Nor has EPA cited to its own regulations to support the concept of withdrawal.  Yet EPA now claims that Colorado has withdrawn two elements of its serious SIP submittal for the Denver Metro Nonattainment Area, such that it can continue to not act on those elements.  88 Fed. Reg. at 54,976 n.17.  However, because the plain language of the Clean Air Act does not provide a mechanism for states to withdraw submittals, this Court cannot accept EPA's request to rewrite the Clean Air Act.  EPA is nullifying, not interpreting, the Clean Air Act when it eliminates clear statutory deadlines (and court-ordered deadlines), by creating, out of whole cloth, a mechanism for states to withdraw SIP submittals.

In another case where this issue is subject of motion practice, EPA has claimed that because the plain language of the statute does not prohibit the withdrawal of SIP submittals, states are free to do so.  EPA, Motion to Dismiss, *Center for Biological Diversity, et al. v. EPA*, Case No. 23-cv-00148-JST, Dkt. No. 21, at 15 (N.D. Cal. May 25, 2023) [hereinafter, "EPA Motion to Dismiss"].  This argument has no merit.  If a statute talks about black, an agency is not free to define black to mean white, even though the statute does not expressly prohibit the agency from defining black in this way.

The D.C. Circuit, for example, did not permit EPA to use a procedure that was not contemplated in the Clean Air Act to extend the statutory deadline by which the Washington, D.C. ozone nonattainment area needed to attain the ozone standard because "the plain terms of the Act preclude an extension of the sort the EPA granted here."  *Sierra Club v. EPA*, 294 F.3d 155, 160–61 (D.C. Cir. 2002).  There, the states in charge of the nonattainment area requested

via a letter an extension of the deadline without a simultaneous reclassification of the area to a worse level of nonattainment, as the Clean Air Act requires for an area that fails to attain by the deadline.  *Id*. at 159.  EPA then attempted to extend the statutory deadline via a new procedure cut from whole cloth.  According to the D.C. Circuit, even though the Act did not bar EPA from doing so explicitly, the fact that the procedure contravened the Act's deadlines meant that "EPA was without authority in the Act or in [the Court's] precedent to extend the attainment deadline for the Washington Area."  *Id*. at 161–62.  EPA could not invent a new procedural mechanism where the Act already provided for a clear process.  *See id*.

So too here.  The statute imposes a mandatory duty on EPA to act upon SIP submittals no more than 12 months after the date the SIP submittal is deemed complete.  42 U.S.C. § 7410(k)(2)–(4).  If the SIP submittal is inadequate, EPA must disapprove it and thereby start the two-year clock for EPA to fill the gap with a Federal Implementation Plan.  42 U.S.C. § 7410(c)(1).  Allowing for withdrawal effectively eliminates these clear deadlines.

It is not an interpretation of the Clean Air Act that EPA can offer in support of withdrawal.  It is a nullification.  What EPA calls its interpretation directly contradicts the plain language of 42 U.S.C. § 7410(k)(2)–(4) and 7410(c)(1).  "Where the language of the statute is plain, it is also where the inquiry should end." *WildEarth Guardians v. Jackson*, 870 F.Supp.2d 847, 851 (N.D. Cal. 2012) (citations omitted).  Congress has directly spoken on the issue.

Because the Clean Air Act does not allow EPA to accept Colorado's withdrawal of its SIP submittal, this Court cannot accept EPA's refusal to act on the Reasonably Available Control Measures and Attainment Demonstration elements of that submittal.  The notion that Congress' failure to explicitly prohibit EPA from coming up with interpretations of the Act that defeat the

Act's clear deadlines and mandatory duties somehow allows EPA to make such interpretations is entirely unreasonable.

### B. Withdrawal allows states and EPA to defeat Congressionally imposed and, in this case, court-imposed, deadlines.

EPA's stance of permitting states to withdraw SIP submittals at any time allows states and EPA to indefinitely defeat the statutory deadlines Congress created for EPA (1) to act on SIP submittals in 12 months, 42 U.S.C. § 7410(k)(2)–(4); and (2) to promulgate Federal Implementation Plans after two years, 42 U.S.C. § 7410(c)(1).  In fact, EPA has recognized that withdrawal creates a "threat that states may continually submit and withdraw plans to skirt their obligations under the Act."  EPA Motion to Dismiss, at 15.

This threat starts with a state providing EPA with a SIP submittal for EPA to approve. After the plan is deemed complete, EPA has 12 months to approve or disapprove, in whole or in part, the SIP submittal.  42 U.S.C. § 7410(k)(2)–(4).  If the state then withdraws the SIP submittal, EPA claims that the 12-month deadline no longer applies.  There is then no new Clean Air Act deadline that governs when the state needs to provide EPA with a new SIP submittal to fill the void.  That is because the statutory scheme set forth in the Clean Air Act does not provide for withdrawal or any process related to it.

Further, the two-year clock for EPA to fill the void left by a state's failure to provide an adequate plan with a Federal Implementation Plan only starts ticking if EPA finds that a state did not submit a plan (a Finding of Failure to Submit), or if EPA disapproves a state's submittal.  42 U.S.C. § 7410(c)(1)(A), (B).  Because allowing for withdrawal means that neither of these events, clearly contemplated in the Act, took place, this deadline is also eliminated by withdrawal.  Thus, contrary to the Act, after withdrawal, there is no deadline for a state to submit

a new SIP submittal and no deadline for EPA to fill the gap with a Federal Implementation Plan. There is also no means of preventing this process from repeating over and over again—where states submit and withdraw plans and repeatedly defeat the Act's clear deadlines.

EPA has claimed it will safeguard against this threat by issuing a Finding of Failure to Submit after a state withdraws its SIP submittal. EPA Motion to Dismiss at 15. This Finding of Failure to Submit would start the two-year clock for EPA to fill the gap with a Federal Implementation Plan. 42 U.S.C. § 7410(c)(1)(A). There are several problems with this false solution.

First, even if EPA were to issue a timely Finding of Failure to Submit (which it has not in this case, even five months after Colorado withdrew the two SIP elements at issue), this still results in an extension of Clean Air Act deadlines. EPA was required to act on Colorado's SIP submittal on September 29, 2023. This deadline for final action has been eliminated by withdrawal. Further, if the SIP submittal is inadequate, EPA should have disapproved it and started the two-year clock for a Federal Implementation Plan—meaning the Federal Implementation Plan should be due September 29, 2025. Even a day's delay is illegal under the Act and causes irreparable harm to public health and the environment, but, at best, if EPA issued a Finding of Failure to Submit immediately, EPA's approach to withdrawal will extend this deadline by over six months. Five months have passed since the two-year clock was supposed to begin, plus EPA needs to sign a final rule and publish it in the Federal Register, and then the effective date of the Finding is not until a month after publication. *See, e.g.*, 88 Fed. Reg. 23,353 (Apr. 17, 2023). Realistically, it will be several more months or over a year before the two-year Federal Implementation Plan clock even starts.

Second, states can, and often do, submit another SIP submittal before EPA has made the official Finding of Failure to Submit.  In that situation, where a state withdraws a submittal but provides a new SIP submittal before EPA issues the Finding of Failure to Submit, a state could continue to submit and withdraw over and over again, obviating EPA's duty to act on the submittal or to promulgate a Federal Implementation Plan.  A state and EPA could continue this series of withdrawal and resubmission indefinitely, rendering the deadlines in 42 U.S.C. §§ 7410(k) and 7410(c)(1) dead letters.  *See R.J. Reynolds Tobacco Co. v. Cty. of L.A.*, 29 F.4th 542, 553 (9th Cir. 2022) ("In interpreting statutes wholistically, we must strive to "giv[e] effect to each word and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." (quoting *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004) (citation omitted))).

The present situation presents this possibility.  Colorado withdrew its Attainment Demonstration and Reasonably Available Control Measures years after these elements were due—on August 3, 2020—under the Clean Air Act's clear deadlines.  EPA has already disregarded the 12-month deadline for it to take final action on these elements.  Further, EPA has not issued a Finding of Failure to Submit for these elements, and, thus, the two-year Federal Implementation Plan clock has not started.  Colorado could re-submit these elements, such that EPA does not issue a Finding of Failure to Submit to start the two-year clock.  But Colorado could again withdraw the new submission months or years down the road, further postponing EPA's final action on the SIP submittal.  Even if this cycle does not continue indefinitely, allowing withdrawal even once results in more delay than the Clean Air Act allows.

Further exacerbating this problem is the fact that EPA has a long history of noncompliance with Clean Air Act-related deadlines, including deadlines for issuing Findings of

1   Failure to Submit.  The U.S. District Court for the District of Columbia has described this history

2   as an "unblemished record of nonperformance in this corner of the Clean Air Act."  *Sierra Club*

3   *v. Johnson*, 374 F.Supp.2d 30, 33 (D.D.C. Apr. 6, 2005).  The list of Clean Air Act deadline suits

4   premised on EPA's failure to meet SIP-related deadlines is long.  *See, e.g.*, *Center for Biological*

5   *Diversity, et al. v. EPA*, Case No. 3:22-cv-01855-WHO (N.D. Cal. 2022); *Center for Biological*

6   *Diversity, et al. v. EPA*, Case No. 3:22-cv-03309-RS (N.D. Cal. 2022); *WildEarth Guardians v.*

7   *Jackson*, Case No. 4:11-cv-2205-SI (N.D. Cal. 2011); *Communities for a Better Environment v.*

8   *EPA*, Case No. 3:07-cv-3678-JSW (N.D. Cal. 2007).  Aside from being impermissible under the

9   Clean Air Act, allowing for withdrawal puts too much power over deadlines into EPA's hands

10   without any safeguards; power that EPA has shown it should not wield.  It is important to note

11   that this motion would not be before the Court had EPA acted on Colorado's SIP submittal on

12   time—18 months ago.

13

14

15

16

17        **C.        Prior courts, including this Court, have rejected the withdrawal argument.**

18        EPA's attempt to re-write and nullify this part of the Clean Air Act has been explicitly

19   rejected by the U.S. District Court for the District of Columbia.  The D.C. District Court has

20   expressly rejected EPA's attempt to re-write this part of the Clean Air Act. *Sierra Club*, 374

21   F.Supp.2d 30 (D.D.C. Apr. 6, 2005).  In that case, the court was assessing whether EPA needed

22   to approve SIP submittals from 1997 and 1998 submitted by Washington D.C., Maryland, and

23   Virginia, which the court referred to as the "pre-2001 submissions." *Id.* at 31.  EPA claimed that

24   "the states formally withdrew their pre-2001 submissions" and "assert[ed] that these withdrawals

25   removed EPA's duty to act." *Id.* at 33.

26

27

28

The court patently rejected the concept of withdrawal and the proposition that withdrawal removes EPA's duty to act, the same proposition EPA has offered in the present situation.  88 Fed. Reg. at 54,976 n.17.  In so doing, the court stated that "EPA does not cite to the Clean Air Act for that proposition, however, nor does EPA offer any support for the notion that 'withdrawal' of pre-2001 SIPs could push back the deadlines established by Congress."  *Sierra Club,* 374 F.Supp.2d at 33.  EPA still cannot cite to the Clean Air Act, or any other clear support, for the concept that withdrawal of SIPs can obviate clear statutory deadlines.

The D.C. District Court ultimately recognized "EPA's unblemished record of nonperformance in this corner of the Clean Air Act" and determined that this history of missed deadlines and unfulfilled duties necessitated injunctive relief.  *Id.*  The court enjoined EPA to act on the SIP submittal at issue.  *Id.*

Similarly, this Court has previously held that withdrawal cannot moot EPA's obligation to act on SIP submissions in a deadline case similar to this one.  In *WildEarth Guardians v. Jackson*, Judge Gonzalez Rogers had ordered EPA to take final action on a SIP submittal from Kentucky and a SIP submittal from Tennessee by a date certain.  *See* Case No. 11-cv-5651-YGR, at 1–2 (N.D. Cal. Dec. 7, 2012) (hereinafter, "*WildEarth* Order") (Exhibit 4).  After Kentucky withdrew its SIP submittal and Tennessee withdrew part of its SIP submittal, EPA moved the Court to remove EPA's obligation to act on the withdrawn submittals, arguing that, because the submittals were withdrawn, EPA had nothing to act on.  *Id.* at 2.

Judge Gonzalez Rogers stated: "The Court cannot find either a partial withdrawal of the SIP submittal, or a withdrawal and submission of a revised SIP, effectively moots EPA's obligations to act – either in accordance with the requirements of 42 U.S.C. §§ 7410(k)(1)(B) & (k)(2)–(3) [(the 12-month clock for EPA to act on submittals)] or 42 U.S.C. § 7410(c) [(the two-

year federal implementation plan clock)].  EPA can point to no statutory provision or regulation that extends its time to act when a state modifies its submittal in these ways." *Id*.

It is true that the Court did not order EPA to act on elements of the SIP submittals from Kentucky and Tennessee that had been withdrawn.  *Id*. at 2–3.  However, the Court's rationale in the *WildEarth* Order was premised on ensuring that Clean Air Act deadlines were not contravened or postponed through withdrawal.  *Id*.  Specifically, in the case of the Kentucky submittal, Kentucky had withdrawn its submittal *but had fully replaced* the submittal with a new, updated SIP submittal *before* EPA's deadline to act under the Court's original order.  The Court ordered EPA to act on the new, revised SIP submittal from Kentucky, but again stated, "EPA's time for review is not restarted by those revisions." [1]  *Id*. at 2.  Thus, no deadlines were affected or eliminated through the withdrawal and, more importantly, there was no gap left by withdrawal, where the state was left without any deadlines to produce a SIP, and EPA was left without any deadline for a Federal Implementation Plan.  EPA still had a mandatory duty to take action under the *WildEarth* Order.

In the case of the withdrawn portion of Tennessee's SIP submittal, the Court ordered EPA to act on the remainder of the submittal but not the withdrawn portion.  *WildEarth* Order at 3.  In that situation, because EPA moved to amend the deadline for final action well before the Court-imposed deadline to do so, the Court ordered EPA to issue a Finding of Failure to Submit for the withdrawn portion.  *Id*.  Practically speaking, this Finding of Failure to Submit meant the

---

[1] This approach of allowing states to "supplement" existing SIP submittals with further SIP submittals is a procedural mechanism that, unlike withdrawal, does not result in the resetting or elimination of Clean Air Act deadlines.  Supplementation, not withdrawal, is the appropriate mechanism for states that may need to improve existing SIP submittals in light of new information.

two-year clock for a Federal Implementation Plan started no later than it would have if EPA had disapproved the withdrawn SIP submittal.  Thus, EPA did not violate a Court-ordered deadline, and, by issuing the Finding of Failure to Submit for the withdrawn portion, started the two-year Federal Implementation Plan clock, during which it needed to fill the gap left by the state.

Both of these situations differ from the facts before this Court, because EPA does not have a replacement SIP submittal from Colorado to act on.  Also, EPA did not move to amend the Consent Decree to remove its obligation to act on the withdrawn elements, contrary to the requirements of Condition 5 of the Consent Decree, which requires a written stipulation from the parties or a motion by EPA for good cause shown pursuant to the Federal Rules of Civil Procedure to modify any provision of the Consent Decree.  Consent Decree at 15–16.  Thus, this Court does not have an opportunity to require EPA to issue a Finding of Failure to Submit before the September 29, 2023 deadline in Condition 1(a) of the Consent Decree, to prevent withdrawal from eliminating any deadlines.  The result is that, accepting EPA's position, EPA no longer has a mandatory duty to act on the Attainment Demonstration or Reasonably Available Control Measures in this case, contrary to the Act and case law.  Allowing for withdrawal has obliterated clear Clean Air Act and Consent Decree deadlines, rendering EPA and Colorado entirely unaccountable when it comes to producing a long overdue plan for protecting public health and welfare from the harms of ozone.

### D.    Withdrawal of SIP submittals interferes with other SIP requirements and undermines the Act as a whole.

Allowing states to withdraw SIP submittals and effectively reset deadlines for EPA to act on those submittals weakens the Clean Air Act's statutory scheme and undermines its effectiveness.  *See Barr*, 941 F.3d at 940 ("In construing words in a statute, we must also look to

the language and design of the statute as a whole…and read the specific words with a view to

their place in the overall statutory scheme.") (internal citations omitted).  There are serious

consequences of allowing withdrawal that eliminates EPA's duty to act, which results in

unacceptable ripple effects.  The many moving pieces of the Act work together to protect public

health and welfare.  But when one piece stops moving, the entire system is impaired.

   For example, one of the elements at issue here is the Reasonably Available Control

Measures, a required element that states like Colorado must develop to reduce pollution in

nonattainment areas.  42 U.S.C. § 7502(c)(1).  This results in requirements for equipment on

emitting facilities to ensure attainment of the NAAQS by the attainment date.  This equipment

takes time to acquire, install, and get running.  In cases, like this, where RACM is not approved

or disapproved by EPA for so long, ultimately no equipment meets the requirements for RACM

because, by the time that industry can properly implement the equipment, the attainment date has

already passed or is imminent.  Unfortunately, this occurred recently in Texas.  In a proposed

SIP submittal, Texas recently concluded "that no potential control measures met the criteria to be

considered RACM [(Reasonably Available Control Measures)].  Because it is not possible to

implement any control measures before January 2023 [(the attainment date for the Texas areas)],

no control measures can meet the criteria of advancing attainment of the NAAQS."  Texas

Commission on Environmental Quality, *Revisions to the State of Texas Air Quality*

*Implementation Plan for the Control of Ozone Air Pollution*, at 3, 72 (May 31, 2023) [2] (Exhibit

5).

---

[2] *Available at* https://www.tceq.texas.gov/downloads/air-quality/sip/ozone/dfw/naaqs-2015/
22021sip_dfw_ad_sip_pro.pdf (last accessed November 29, 2023).

The same problems adhere in other related Clean Air Act contexts if withdrawal is allowed.  The Best Available Control Measures, or "BACM," SIP element is required for serious nonattainment areas for the fine particulate matter NAAQS.  42 U.S.C. § 7513a(b)(1)(B). Similar to Reasonably Available Control Measures, BACM is defined as any technologically and economically feasible control measure for reducing fine particulate emissions that can be implemented in whole or in part "no later than 4 years" of the area being downgraded from a "moderate" to a "serious" area.  *Id.*; 40 C.F.R. § 51.100.  The date by which BACM must be implemented is set *independently* from the Act's SIP approval deadlines, that is, within four years after the date of reclassification to a serious nonattainment area.

This set date works because the state and EPA have deadlines to submit and approve a SIP submittal that gives effect to BACM.  But if EPA and the state are allowed to reset the deadlines for SIP submittals covering BACM, then the effectiveness of BACM is reduced.  This is because many control measures take significant amounts of time to design, procure, and install, such as a scrubber on a fossil fuel burning power plant.  *See* 81 Fed. Reg. 58,009, 58,084–85 (Aug. 24, 2016) (stating that states should "determine the earliest date by which a control measure or technology can be implemented in whole or in part" when determining what pollution control measures qualify as BACM).  Even one reset of the deadline for SIP submittals by allowing for withdrawals would reduce the options for control measures.  After the reset, certain control measures may no longer be able to be implemented within the four-year period after the reclassification to serious nonattainment, weakening the options for reducing dangerous pollution levels through BACM.

The plain language of the Clean Air Act sets up a mandatory system with binding due dates for SIP submittals, and binding due dates for action on those submittals or Federal

1   Implementation Plans.  This system contains inter-related deadlines for SIP requirements like

2   those at issue in this case.  EPA is attempting to destroy the Congressionally created program by

3   saying that states can opt out of the mandatory deadline system through withdrawal.  But, as the

4   D.C. Circuit has explained, the Clean Air "Act places states onto a one-way street[.]"  *South*

5   *Coast Air Quality Management District v. EPA*, 472 F.3d 882, 900 (D.C. Cir. 2006).  This Court

6   must reject EPA's request to re-write the Clean Air Act to allow unlimited U-turns.

7

8

9
        **E.     EPA should be required to act on the Reasonably Available Control**
10           **Measures and Attainment Demonstration by March 15, 2024.**

11       In the Consent Decree, EPA agreed to take action on Colorado's serious SIP submittal by

12  September 29, 2023.  Consent Decree at 7.  This meant EPA agreed to act on Colorado's SIP

13  submittal in 106 days, about 3.5 months, counting from the date the Consent Decree was entered.

14  It is entirely reasonable for EPA to perform the same action in the same amount of time, 106

15  days, from the date of this motion to act on the Reasonably Available Control Measures and

16  Attainment Demonstration elements of Colorado's SIP submittal.  Thus, we respectfully request

17  that this Court require EPA to take final action on those two elements and sign a notice of final

18  rulemaking by March 15, 2024.

19       Further, we respectfully ask that the Court require EPA to forward, within 15 business

20  days of signature, the signed notice to the Office of Federal Register for review and publication

21  in the Federal Register, as required by Condition 3 of the Consent Decree.

22       This timeframe is entirely reasonable.  Aside from mirroring what EPA has already

23  agreed to, the Reasonably Available Control Measures and Attainment Demonstration elements

24  were already before EPA for 20 days before Colorado "withdrew" the plan (June 15, 2023, to

1  July 5, 2023).  Further, a deadline of March 15, 2024, would require EPA to act over 21 months
2  after its initial statutory deadline to act on Colorado's SIP passed on June 2, 2022.
3
4                                    **CONCLUSION**
5
6          For the foregoing reasons, we respectfully request that this Court order EPA to comply
7  with Condition 1(a) of the Consent Decree and sign a notice of final rulemaking concerning the
8  Reasonably Available Control Measures and Attainment Demonstration elements of Colorado's
9  2008 ozone NAAQS SIP submittal by March 15, 2024.  We further request that the Court order
10 EPA to forward this signed notice to the Office of the Federal Register for review and
11 publication within 15 business days of signature.
12
13
14                                      Respectfully submitted,
15                                      */s/ Ryan Maher*
16
17                                      Ryan Maher (*Pro Hac Vice,* D.C. Bar No. 1620024)
                                       Jonathan Evans (Cal. Bar. No. 247376)
18                                      CENTER FOR BIOLOGICAL DIVERSITY
                                       1411 K Street NW, Suite 1300
19                                      Washington, D.C. 20005
                                       Phone: 781-325-6303
20                                      Email: rmaher@biologicaldiversity.org
21
22                                      *Counsel for Plaintiffs Center for Biological
                                       Diversity and Center for Environmental Health*
23
24 DATED: November 30, 2023
25
26
27
28